IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2016


**STATE OF TENNESSEE v. DARRYL CLAXTON**


**Appeal from the Criminal Court for Shelby County**
**No. 13-02927     Chris Craft, Judge**

_____


**No. W2015-00885-CCA-R3-CD  -  Filed April 20, 2016**

_____


Following a jury trial, Darryl Claxton ("the Defendant") was convicted of first degree premeditated murder and sentenced to life imprisonment for the death of Terry Johnson ("the victim").  The Defendant raises the following issues on this direct appeal: (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred when it allowed a witness to testify about the Defendant's association with a "group of young men" in violation of Tennessee Rules of Evidence 403 and 404(b); (3) whether the trial court erred when it allowed a witness to "speculate" about the disposition of the murder weapon in violation of Tennessee Rule of Evidence 602; and (4) whether the cumulative effect of the errors requires a new trial.  Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Darryl Claxton.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

*Trial*

Cary Peete testified that he was a security officer assigned to Greenbriar Apartments in Memphis. On November 14, 2012, Mr. Peete was sitting in his parked car when he saw a group of people standing in the breezeway of one of the apartment buildings. Mr. Peete shined a hand-held spotlight on the group and told them to move out of the breezeway, and most of the group followed Mr. Peete's command. Mr. Peete placed the spotlight on the front seat of his car, looked back at the breezeway, and saw the Defendant fire a weapon several times. Mr. Peete exited his vehicle and aimed his firearm at the Defendant, but the Defendant "took off running." Mr. Peete and his partner gave chase. The Defendant ran through the breezeway and behind the building. Mr. Peete ran in front of the apartment building in order to cut off the Defendant's path. When the Defendant saw that Mr. Peete and his partner were approaching him from different directions, he turned, placed his hands in the air, and "got down on his knees." The Defendant did not say anything once he surrendered to the security guards. Mr. Peete and his partner took the Defendant into custody and led him back to the parking lot. Mr. Peete then returned to the breezeway and found the victim still alive. Mr. Peete called 911, and when police arrived, the Defendant was turned over to their custody.

On cross-examination, Mr. Peete agreed that it was dark at the time of the offense, but he said the area was illuminated by lights. Mr. Peete said he saw the group of "four or five guys" exit an apartment into the breezeway. A female stood in the open door of the apartment, and the men stood in the breezeway for "some seconds" before Mr. Peete shined his spotlight on them. The Defendant was standing in the breezeway with his right foot propped against the stairs. Mr. Peete agreed that there could have been more people in the breezeway that he could not see from his vehicle. However, Mr. Peete maintained that he could clearly see the Defendant from his vehicle. Mr. Peete said he could see the Defendant's profile and recalled that the Defendant had a slight build, a "fade" haircut, and was wearing a light blue "hoodie." Although Mr. Peete could not see the Defendant's gun, he saw "muzzle flash" when the gun was fired. Mr. Peete stated that the Defendant pulled the gun from underneath his hoodie and held it with his right hand. Mr. Peete noted that he did not see the Defendant drop the gun but that the Defendant was unarmed when Mr. Peete took him into custody. To Mr. Peete's knowledge, the gun was never found.

Robin Milam testified that, at the time of the offense, she lived with her children and her friend, McKeisha Webb, in the building where the victim was killed. Ms. Webb was dating the victim. Ms. Milam stated that she also knew the Defendant "through

school and [as an] acquaintance[.]" The victim came to visit Ms. Webb on the day of the offense. Over the course of the day on which the victim was killed, four or five people came to visit Ms. Milam's apartment, including the Defendant, Terry Shaw (whom Ms. Milam understood to be the Defendant's cousin), Deshun, and King.[1] The visitors remained in Ms. Milam's living room. While they were there, Ms. Milam overheard a conversation between the Defendant, Mr. Shaw and someone else—Ms. Milam could not recall who else was party to the conversation. Ms. Milam stated, "They were saying like ['][M]an, if someone wants to pay some money or something, would you kill somebody.[']" Ms. Milam said she was not listening to the conversation because she was moving between rooms in her apartment. The victim was in Ms. Webb's bedroom when this conversation took place.

Later that evening, Ms. Milam "put everybody out because [she] got sick of company." Ms. Milam later clarified that she did not ask the victim to leave at that time. Ms. Milam, her two children, Ms. Webb, the victim, and Chris Hampton[2] were in the living room watching television. About an hour later, Mr. Shaw returned to the apartment to charge his phone. Mr. Shaw remained in the living room, and Ms. Webb and the victim had moved to one of the bedrooms. Ms. Milam told Mr. Shaw not to open the door for anyone because Ms. Milam did not want any more company. Later, Ms. Milam heard "hard knocks" on her front door and the Defendant say that he wanted his phone charger. Mr. Shaw told Ms. Milam that he wanted to open the door for the Defendant, but Ms. Milam told Mr. Shaw to leave the apartment instead. The Defendant continued to pound on Ms. Milam's door, and the victim and Ms. Webb came into the living room. Mr. Shaw opened the door, and the Defendant came into the apartment. Ms. Milam stated that the Defendant appeared to be angry and recalled that he "mudged" or bumped the victim with his shoulder as he came in the door. Ms. Milam said the Defendant appeared "[m]ean" and that he and the victim started to argue. At that point, Ms. Milam told the Defendant and Mr. Shaw to leave her apartment.

Approximately five or ten minutes after the Defendant and Mr. Shaw left, Ms. Webb and the victim left to go to the store. Ms. Milam walked Ms. Webb and the victim to her door, let them out, and then closed and locked her front door. She said there was "a crowd" in her breezeway but that she did not see the Defendant when she opened the door. As soon as the victim and Ms. Webb left, Ms. Milam heard arguing, and five or ten seconds later, she heard gunfire. Ms. Milam heard Ms. Webb say, "[O]pen the door, open the door, [the victim's] been shot," and Mr. Hampton let Ms. Webb into the apartment. Once inside the apartment, Ms. Webb told Ms. Milam to call an ambulance

---

[1] Ms. Milam did not know Deshun's last name or King's legal name. Therefore, we will refer to them by Deshun and King in this opinion.

[2] It is not clear from the record when Mr. Hampton arrived at Ms. Milam's apartment.

and identified the Defendant as the person who shot the victim. Through her open door, Ms. Milam saw the victim lying in the breezeway, but she did not see the Defendant or Mr. Shaw.

On cross-examination, Ms. Milam stated that she had twice been convicted of theft of property. Ms. Milam denied knowing that the Defendant had a twin brother. Ms. Milam reiterated that the Defendant was angry when he returned to the apartment, and she recalled that he said, "I don't want to—I don't want to be in this house, I just need my damn charger." Ms. Milam noted that she gave a statement to police the night of the shooting, but she said she did not tell anyone about the conversation she overheard in her living room until she told the prosecutor the week before trial.

McKeisha Webb testified that she had been "staying" at Ms. Milam's residence for a couple of months at the time of the shooting. On the night of the shooting, Ms. Webb, Ms. Milam, Mr. Hampton, the victim, and Ms. Milam's two children were in Ms. Milam's apartment. Several people, including the Defendant, had been to Ms. Milam's apartment earlier in the day, but they had left before the shooting. The victim also left but later returned with King. About twenty minutes after the victim returned, Mr. Shaw knocked on Ms. Milam's door. Ms. Milam let Mr. Shaw in, and Mr. Shaw "went to the back with [the victim] and King." Shortly after that, the Defendant began "beating on [Ms. Milam's front] door hysterically." Ms. Webb was seated on the couch near the door, but she did not open the door because she had been instructed not to let anyone in the apartment. However, the victim came into the living room and opened the door for the Defendant. The Defendant "c[a]me barging in" and bumped the victim. An argument started between the victim and the Defendant, which lasted five to ten minutes. The Defendant then left the apartment without speaking to anyone else. Ms. Webb reported that the victim was not mad, but he was pacing and "seemed like he was bothered by the argument[.]" Ms. Webb agreed that the Defendant did not make any threats toward the victim during this argument.

"Maybe five minutes" after the Defendant left, Ms. Webb and the victim left the apartment to go to the store. The Defendant was standing in the breezeway, and he and the victim began to argue again. Ms. Webb stated she could not remember "word-for-word what the argument was about[,]" but she recalled that, before shooting the victim, the Defendant said "[D]on't say s*** else to me, on the FAM." Ms. Webb explained that the FAM was "a neighborhood group of young boys." The Defendant then shot the victim "four or five times." Ms. Webb was standing "right next" to the victim when the Defendant opened fire. Ms. Webb said there was "no doubt in [her] mind" that the Defendant was the person who shot the victim. The Defendant ran from the scene after the victim fell to the ground. Ms. Webb did not see what the Defendant did with the gun.

Ms. Webb recalled that one of the neighbors, Ieasha Malone, was standing in her doorway at the time of the shooting, but she did not recall anyone else being in the breezeway. The door to Ms. Milam's apartment was locked, and Ms. Webb did not have access to her own phone, so Ms. Webb "snatched" Ms. Malone's phone to call the police. Eventually, Mr. Hampton let Ms. Webb back into the apartment.

Later that night, Ms. Webb was taken to the police precinct, where she gave a statement and viewed a photo lineup. Ms. Webb circled the second photo in the lineup, wrote, "Darryl Claxton[,] I know him as Pee Wee[,] he shot [the victim] several times[.] [H]e's number 2 the one I [circled][,]" and signed the page.

On cross-examination, Ms. Webb said she had known the Defendant since they "were in the 7th or 8th grade." Ms. Webb confirmed that she did not know anyone else who was pictured in the photo lineup. Ms. Webb stated that she was not sure how long the Defendant had been knocking loudly on Ms. Milam's door, but she estimated that it was three minutes. Ms. Webb noted that Mr. Shaw stayed in the back of the apartment through the entire argument and that he did not leave with the Defendant. Ms. Webb said she did not see which way the Defendant ran after the shooting because her focus was on the victim. Ms. Webb also agreed that her first statement to police said that "Darren Claxton" was the shooter.[3] However, Ms. Webb noted numerous things in her first statement that were incorrect, and she explained that the police were typing what she said during the interview. She admitted that she signed the statement and initialed each page to indicate that what was in the statement was correct, but she said that she did not read the statement before she signed it.

On redirect examination, Ms. Webb confirmed that, during her first meeting with the State, she told the attorneys that there were inaccuracies in her first written statement to police. She also confirmed that she identified the Defendant as "Darryl Claxton" in the photo lineup. Ms. Webb stated that she had no doubt that the Defendant shot the victim, and she denied telling anyone that someone other than the Defendant was the shooter.

Ieasha Malone testified that she lived across the breezeway from Ms. Milam. She stated that she was a close friend of the victim and that she knew Ms. Webb, Mr. Shaw, and the Defendant. Ms. Malone reported that she saw Mr. Shaw and the Defendant outside Ms. Milam's apartment on the evening of the shooting. Mr. Shaw went into the apartment while the Defendant stood at Ms. Malone's door, "joking with [her.]" After they had finished speaking, the Defendant knocked on Ms. Milam's door, and someone opened the door to let him in. Ms. Malone remained in her own doorway because she was watching a friend as her friend walked with her children from Ms. Malone's apartment to her own apartment. While she was waiting for her friend to arrive home

---

[3] From the record, it appears that the Defendant has a brother named Darren Claxton.

safely, she heard "commotion" coming from Ms. Milam's apartment, but she could not hear what the argument was about or who was arguing. Then, the Defendant, the victim, Ms. Webb, and Mr. Shaw exited Ms. Milam's apartment. The Defendant and the victim were arguing when they came out of the apartment. Ms. Malone still could not determine what the argument was about, but she heard derogatory name-calling. Ms. Malone recalled that the victim hit his hand against his fist and called the Defendant "weak." Then the Defendant pulled out a gun, said "I been [sic] murking motherf*****s[,]" and shot the victim "at least three to five times." Ms. Malone explained that "murking" meant "killing." Mr. Shaw ran when the firing started, and Ms. Malone did not see where he went. Ms. Malone also did not see where the Defendant went after the shooting. Ms. Webb went back into Ms. Milam's apartment.

After the police arrived, Ms. Malone was transported to the police station where she gave a statement and viewed a photo lineup. Ms. Malone circled the second photo in the lineup and wrote, "I saw [the Defendant][,] which is number 2 in the lineup[,] shoot [the victim]. Tonight [at] 8:20 November 14, 2012[.]" Her signature appears below her written identification.

On cross-examination, Ms. Malone denied knowing the Defendant's brother, Darren Claxton. Ms. Malone also confirmed that the Defendant, the victim, Ms. Webb, and Mr. Shaw all exited Ms. Milam's apartment at the same time. Ms. Malone stated that, after the shooting, she knelt next to the victim to comfort him and stayed with the victim until police arrived. When police arrived on the scene, Ms. Malone was handcuffed, placed in the back of a police car, and taken to the police station. Ms. Malone said she did not feel that she was free to leave and that she was still handcuffed when she gave her statement to police. Ms. Malone denied telling police that her brother Dante was present at the shooting, and she denied having a brother named Dante. She also denied telling police that the Defendant had shown her a gun before. Ms. Malone confirmed that she signed the statement and initialed each page, indicating that its contents were true and correct. However, Ms. Malone said, "I was really frustrated at the time. I just, you know, glanced over it. I really didn't . . . look." She further explained, "Like I said, ma'am, I was, you know, mourning at the time. I really wasn't just reading it like I supposed [sic] to. I really just glanced at it because I was really ready to go home." Ms. Malone also said she did not know any of the other people depicted in the photo lineup. On redirect examination, Ms. Malone said she selected the Defendant's photo because he was the person who shot the victim, not because he was the only person she knew in the lineup.

Officer Darrold Hudson of the Memphis Police Department ("MPD") testified that he responded to a shooting at Greenbriar Apartments on the night of the offense. When Officer Hudson arrived at the scene, he observed a large crowd of people outside the

breezeway.  As he approached the breezeway, Officer Hudson saw the victim lying face down on the ground with blood coming out of his neck.  On cross-examination, Officer Hudson said he did not see a gun in the breezeway and that he did not find a gun outside the apartment building where the victim was found.  Officer Hudson explained that he remained with the victim's body the entire time he was at the scene and that he did not search the rest of the apartment complex grounds for the gun.

MPD Lieutenant Matt Pugh testified that he responded to Greenbriar Apartments on the day of the shooting.  Lieutenant Pugh recalled that it was dark when he arrived but that the breezeway and parking lot were lit and that a crowd of people had gathered near the breezeway.  Lieutenant Pugh spoke with the victim's girlfriend, who identified the Defendant as the shooter.  Lieutenant Pugh and other officers also attempted to locate the murder weapon by securing "a fairly large area." Lieutenant Pugh noted that officers searched behind air conditioning units and in the wooded area behind the apartment complex but they did not find the weapon.  The following exchange occurred between Lieutenant Pugh and the State concerning several people gathered in the area near the shooting:

> [THE STATE:]  Okay.  Now, did you search the people that were standing around out there?
>
> [LIEUTENTANT PUGH:]  No, ma'am.
>
> [THE STATE:]  So if the suspect had passed that gun off to somebody—
>
> [DEFENSE COUNSEL]:  Object to leading.
>
> [THE STATE:]  Hypothetically.
>
> [DEFENSE COUNSEL:]   Judge—
>
> THE COURT:  I guess you can pose a hypothetical.
>
> [THE STATE:]  I am, Judge.
>
> [THE STATE:]  Hypothetically, if the suspect had passed that gun off to somebody that was in the breezeway or behind that building, would you have searched everybody out there to see if you could find that weapon that way?
>
> [LIEUTENTANT PUGH:]  If we had reasonable suspicion or we had information that he passed it, certainly.  But it would have been hard—there was [sic] a lot of people out there—to search everybody out there.

On cross-examination, Lieutenant Pugh agreed that any suggestion that the Defendant passed the gun to someone in the crowd would have been "pure speculation." Lieutenant Pugh also reiterated that he did not search anyone in the crowd because he had no reasonable suspicion that the Defendant passed a gun to someone before he ran from the scene. Lieutenant Pugh noted that he went back to the crime scene the next day to look for the gun again but that he did not find anything.

MPD Officer Michael Spearman testified that he responded to the crime scene. Officer Spearman recalled that, after the medical examiner moved the victim, Officer Spearman collected a bullet fragment that was located under the victim's body. However, Officer Spearman did not observe any shell casings in the breezeway. He explained that an "automatic" firearm would expel shell casings when it was fired but a revolver would not. On cross-examination, Officer Spearman said he did not look for bullet holes or any other bullet fragments on the ground.

MPD Officer Robert Carlson testified he responded to the scene as the Greenbriar Apartment security officers were arresting the Defendant. Before taking the Defendant into police custody, Officer Carlson conducted a pat-down search. Officer Carlson reported that he did not find a gun, a cell phone, or any identification on the Defendant. On cross-examination, Officer Carlson acknowledged that someone who had recently fired a gun may have gunshot residue on his or her hands. However, over time that residue wears off, especially if the shooter washes his or her hands. In order to preserve gunshot residue evidence, police will sometimes prevent a suspect from washing his or her hands or will place bags on the suspect's hands before conducting tests to detect gunshot residue. Officer Carlson said he did not place bags on the Defendant's hands after taking him into custody, and he was not aware of any attempts to test the Defendant's hands for gunshot residue.

Investigator William D. Merritt testified that, at the time of the offense, he was employed as a MPD homicide detective. At the time of trial, he was employed as an investigator for the Shelby County District Attorney General's office. Investigator Merritt obtained a bag containing the clothes the Defendant was wearing when he was arrested. The evidence bag contained a purple t-shirt and jeans but no phone, identification, or gun.

MPD Lieutenant Joseph Poindexter testified that, the day after the shooting, he was assigned to investigate the victim's death and that he reviewed all the documents that had been created by the Felony Response Team who responded to the crime scene. Lieutenant Poindexter also interviewed the property manager of the apartment complex, who informed him that there was no security camera video of the shooting. Lieutenant Poindexter learned from the medical examiner that a small caliber weapon was used. No such weapon was ever recovered. Lieutenant Poindexter said that he received several tips

that someone other than the Defendant was involved in the shooting but that all the tips "kind of led to dead ends."

On cross-examination, Lieutenant Poindexter said that a bullet fragment was found on the scene but that no ballistic testing of the fragment had been requested. Lieutenant Poindexter also did not request that the Defendant's hands be tested for gunshot residue or that his clothing be tested for blood spatter or DNA evidence. Lieutenant Poindexter explained that he did not request testing of the Defendant's clothes because the reports from the crime scene indicated that the Defendant had "shed some" clothes after the shooting but before he was arrested. On redirect examination, Lieutenant Poindexter said the MPD did not conduct ballistic testing on bullet fragments. He also noted that no shell casings were found at the scene.

Dr. Marco Ross testified that he was the Deputy Chief Medical Examiner for Shelby County and that he performed the victim's autopsy. Dr. Ross noted that the victim had sustained several gunshot wounds—one through-and-through wound to the neck; one wound that entered his front chest, travelled through his left lung and heart, and ended in his back; one wound on his lower back, causing injury to his spinal cord; a through-and-through wound on his left thigh; and a through-and-through wound on his lower left leg. A bullet was retrieved from the victim's mid back area and three bullet fragments were retrieved from his lower back. Dr. Ross noted that there was no evidence of stippling caused by gunshot residue, indicating that the victim was shot from a distance of three feet or more. Following his examination, Dr. Ross concluded that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide.

Following deliberation, the jury found the Defendant guilty of first degree premeditated murder. The trial court approved the verdict in its role as the thirteenth juror and sentenced the Defendant, by operation of law, to life. The Defendant's motion for new trial was denied. This timely appeal followed.

## II. Analysis

*Sufficiency of the Evidence*

The Defendant first argues that the evidence was insufficient to support his conviction because (1) the on-going argument between the Defendant and the victim indicated that the Defendant acted in a state of passion and thus the evidence supports a verdict of voluntary manslaughter; (2) no supporting physical evidence, such as the murder weapon or gunshot residue from the Defendant's hands, was presented to the jury; and (3) Ms. Webb and Ms. Malone were not credible witnesses because their respective testimonies were inconsistent and they were both close to the victim. The

State argues that the evidence was sufficient for the jury to find premeditation, that the eyewitnesses' testimony did not need to be corroborated by physical evidence, and that the credibility of the witnesses was determined by the jury. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

As charged in the indictment, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). "'Premeditation' is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d) (2010). However,

> [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire

- 10 -

to engage in the conduct or cause the result[.]" Tenn. Code Ann. § 39-11-106(18) (2010).

First, the Defendant argues that the evidence supports a verdict of voluntary manslaughter as opposed to first degree premeditated murder. "Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." State v. Davison, 121 S.W.3d 600, 614 (Tenn. 2003). Premeditation involves determining a defendant's state of mind, and often there is no direct evidence of such. Id. Therefore, premeditation may be proven by circumstantial evidence. Id. (citing State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992)). Our supreme court has previously identified several non-exclusive circumstances that may warrant a finding or inference of premeditation, including:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

Id. (citing Bland, 958 S.W.2d at 660; State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998)); see also State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

Viewing the evidence in a light most favorable to the State in this case, we conclude that there was sufficient evidence for the jury to find that the Defendant acted with premeditation. About an hour before the shooting, Ms. Milam overheard the Defendant speaking with Mr. Shaw and others about killing someone for money. Ms. Milam and Ms. Webb testified that the Defendant left Ms. Milam's apartment several minutes before the victim. The Defendant was in the breezeway when the victim left the apartment, and the shooting happened immediately after Ms. Milam closed her apartment door. Before he shot the victim, the Defendant said "[D]on't say s*** else to me, on the FAM[,]" and "I been [sic] [killing] motherf****s." Additionally, there is nothing in the record to indicate that the victim was armed; the Defendant ran from the scene of the shooting, disposed of the murder weapon immediately after the shooting, and it was never recovered; and the Defendant surrendered himself to the Greenbriar Apartments security guards within minutes of the shooting. Further, the jury could conclude that the Defendant's calm demeanor following his arrest was evidence of premeditation. Such evidence was sufficient to support the jury's finding of premeditation.

Second, the Defendant claims that the evidence was insufficient because no physical evidence was presented to the jury to corroborate the eyewitnesses' testimony.

- 11 -

Specifically, the Defendant notes that the murder weapon was never recovered and that his hands were never tested for gunshot residue, despite his being apprehended almost immediately after the shooting. Physical evidence is not required for a conviction, and the State is not required to prove a defendant's identity as the perpetrator through scientific testing or evidence. State v. Joseph William Wilson, No. W2001-03007-CCA-R3-CD, 2003 WL 261939, at *6 (Tenn. Crim. App. Feb. 3, 2003), perm. app. denied (Tenn. May 27, 2003); see also State v. Eddie Lee Taylor, No. W2001-01077-CCA-R3-CD, 2002 WL 1732340, at *3 (Tenn. Crim. App. Apr. 4, 2002) (holding that "the lack of physical evidence, and the minor inconsistencies in [the eyewitness's] testimony about matters not involving the [d]efendant's identity, do not create reasonable doubt" that would allow this court to overturn the verdict).

In this case, three eyewitnesses, Mr. Peete, Ms. Webb, and Ms. Malone, saw the Defendant shoot the victim multiple times. Ms. Webb was standing mere feet from the victim when he was shot, and she testified that there was "no doubt in [her] mind" that the Defendant was the shooter. Further, Ms. Webb and Ms. Malone identified the Defendant as the shooter in a photo lineup within hours of the offense. Ms. Milam also overheard the Defendant speaking with others about the possibility of killing someone for money. Physical evidence was not required to establish the Defendant's identify as the perpetrator.

Finally, the Defendant argues that Ms. Webb and Ms. Malone were not credible because they were close with the victim and there were "significant inconsistencies" in their accounts of the shooting that should cast doubt on their testimony. However, as noted above, questions of fact, credibility of witnesses, and the weight and value to be given to the evidence are issues which are resolved by the jury, and we will not reweigh those findings on appeal. Bland, 958 S.W.2d at 659. The Defendant's claim is without merit. We conclude that the evidence was sufficient to support the Defendant's conviction for first degree premeditated murder.

*Witness Testimony about "A Group of Young Men"*

After the jury was impaneled and sworn, the State, outside the presence of the jury, informed the trial court that there was a legal issue "involving gang aspects of the case" that needed to be addressed. No written motion to exclude testimony of gangs had been filed. After discussing the issue with counsel for the State and the Defendant, the trial court stated that it would need to conduct a Tennessee Rule of Evidence 404(b) hearing outside the presence of the jury. The hearing was postponed until the next day.

On the next morning, the trial court addressed the gang issue before the jury was brought into court. The issue involved a statement the Defendant made immediately before shooting the victim about a local gang known as the "FAM." The State took the

position that the statement was relevant to show premeditation and was not being offered as proof of prior bad acts. The trial court rejected the State's position and stated that it would look at the statement under Rule 404(b) because "some jurors might conclude that being in the FAM is a bad act."

At the Rule 404(b) hearing, the State called McKeisha Webb who testified that she was standing with the victim when he was shot. Immediately prior to shooting the victim, the Defendant said, "[C]uz, don't say sh** else to me. On the FAM." Ms. Webb explained that the FAM was "a neighborhood gang or a group." Ms. Webb said she was not a member of the FAM and was not affiliated with them in any way. The following exchange then occurred:

> THE COURT: . . . You said a neighborhood gang and then you said a neighborhood group. We're going to try to avoid the word gang.
>
> [MS. WEBB]: Yes, sir.
>
> THE COURT: And we're going to have some hearings on this to decide whether or not you can say that. But unless anybody tells you not, you'll be allowed to testify to that. But let's not talk about gangs and things like that. You can talk about a group of guys or whatever; okay?
>
> [MS. WEBB]: Yes, sir.
>
> THE COURT: Is that what it is, basically?
>
> [MS. WEBB]: Yes, it's a group of guys.
>
> THE COURT: At first you said group, so what is this thing actually?
>
> [MS. WEBB]: Basically, I really don't know, but it's a group of guys and they're younger guys. They all hang out together.

The State noted that it did not intend to present any testimony about the Defendant's being a member of the FAM and that it only wanted to elicit testimony that the Defendant mentioned the FAM immediately before he shot the victim. Further the State argued that the Defendant's statement to the victim about the FAM was relevant to show premeditation and motive. Although the Defendant acknowledged that his statement would be admissible as an exception to the hearsay rule, the Defendant argued that Ms. Webb should not be permitted to explain what the FAM was because the State had not established that Ms. Webb had a sufficient "base of knowledge" about the group under Tennessee Rule of Evidence 602. Additionally, the Defendant still claimed the

probative value of Ms. Webb's testimony was outweighed by the danger of unfair prejudice under Rule 404(b).

The trial court stated, "I don't see any reason we should mention the word gang ever by the attorneys or anybody else. FAM sounds like family, which is good." The trial court recognized that proof of prior bad acts under Rule 404(b) was no longer an issue since he had instructed the witness and the attorneys not to use the word gang, stating, "I don't think the statement is the problem." The trial court instead turned its attention to Ms. Webb's personal knowledge of the FAM under Rule 602, stating, "I think now we've gotten on to her interpretation of what that means." The trial court found Ms. Webb "competent to testify that the FAM is a group of guys who hang together[.]"

On appeal, the Defendant argues that the trial court abused its discretion in admitting Ms. Webb's testimony about "a group of guys" under Rule 404(b). Further, the Defendant asserts that the record was insufficient to show that Ms. Webb had personal knowledge about the FAM under Rule 602. Finally, the Defendant contends that the prejudicial effect of Ms. Webb's testimony about the FAM substantially outweighed its probative value under Rule 403.

For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Nevertheless, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. The determination of whether evidence is relevant and whether it satisfies the requirements of Rule 403 is left to the sound discretion of the trial court. State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible "when the prior conduct is relevant to an issue other than the accused's character, such as identity, motive, common scheme or plan, intent, or absence of mistake." State v. Adams, 405 S.W.3d 641, 659 (Tenn. 2013); see also State v. Gilliland, 22 S.W.3d 266, 271 n.6 (Tenn. 2000). This court has previously held that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 27, 2001).

By instructing Ms. Webb not to use the word "gang" in her testimony, but instead to use the description she had used during the hearing, that the FAM was "a group of

guys" that "hang out" together, the trial court excised from the Defendant's statement what could have been viewed by the jury to be evidence of "other crimes, wrongs or acts" under Rule 404(b). Association with a group of guys that hang out together is not, in and of itself, a bad act. Therefore, by prohibiting the use of the word gang in reference to the Defendant's statement, the trial court effectively eliminated the 404(b) issue.

We next turn to the Defendant's argument that the probative value of Ms. Webb's characterization of the FAM as a "neighborhood group of guys" was substantially outweighed by the danger of unfair prejudice by "interjecting the issue of street gangs into the trial." See Tenn. R. Evid. 403. First, the Defendant's statement, "[C]uz, don't say sh** else to me. On the FAM[,]" was relevant to show premeditation and motive, and Ms. Webb's characterization of the FAM as a "group of guys" was offered to explain the term used in the Defendant's statement. Further, by specifically instructed Ms. Webb not to use the word "gang," the trial court prevented the very prejudice the Defendant complains of on appeal. The trial court did not abuse its discretion when it allowed Ms. Webb to testify that the FAM was a "group of guys."

Finally, we address the Defendant's contention that the evidence was not sufficient to show that Ms. Webb had personal knowledge of what the FAM was. Tennessee Rule of Evidence 602 states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter." Personal knowledge may be inferred from a witness's statement and the surrounding facts and circumstances. Kendrick v. State, 545 S.W.3d 450, 479 (Tenn. 2015). Although Rule 602 does not define "knowledge," this court has previously said that the rule does not require "absolute certainty." State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000).

In this case, when first asked what the FAM was, Ms. Webb responded, "It's a neighborhood gang or group." After she was told not to use the word "gang," Ms. Webb said, "Basically, I really don't know, but it's a group of guys and they're younger guys. They all hang out together." The trial court found that Ms. Webb had personal knowledge about the FAM under Tennessee Rule of Evidence 602 and that she was competent to testify. While we acknowledge that Ms. Webb prefaced one of her comments about the group with "I really don't know," the rule does not require absolute certainty, and Ms. Webb was clear that the FAM was a group of young men who "hang out" together. The evidence was sufficient to support the trial court's finding that Ms. Webb had personal knowledge of the nature of the FAM.

*Witness Speculation about Disposal of Weapon*

The Defendant next argues that Lieutenant Pugh was allowed to "speculate as to the whereabouts of the weapon" and "surmise 'someone may have picked [the murder

weapon] up.'" The State argues that Lieutenant Pugh did not speculate but, instead, answered a proper hypothetical question using information that was within his personal knowledge.[4]

First, we note that the Defendant did not object to Lieutenant Pugh's testimony on the grounds of speculation. "The failure to make a contemporaneous objection constituted waiver of the issue on appeal." State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008); see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). However, "when necessary to do substantial justice" this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." Adkisson, 899 S.W.2d at 640-41; see also State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the Adkisson standard for plain error relief.) When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. Smith, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

In his brief, the Defendant argues that Lieutenant Pugh "surmised 'someone may have picked [the murder weapon] up.'" However, the portion of the record cited by the Defendant does not contain the statement "someone may have picked it up," and we are unable to find that assertion in Lieutenant Pugh's testimony. Instead, in the portion of the record cited by the Defendant, the following exchange occurred:

[THE STATE:] Hypothetically, if the suspect had passed that gun off to somebody that was in the breezeway or behind that building, would you have searched everybody out there to see if you could find that weapon that way?

[4] The Defendant makes no argument that that the hypothetical question posed to Lieutenant Pugh was improper under the Tennessee Rules of Evidence.

- 16 -

[LIEUTENTANT PUGH:]  If we had reasonable suspicion or we had information that he passed it, certainly.  But it would have been hard—there was [sic] a lot of people out there—to search everybody out there.

Lieutenant Pugh went on to reiterate that he did not search anyone on the scene because he had no reasonable suspicion that the Defendant has passed the gun to anyone, and he agreed that any suggestion that the Defendant passed the gun to someone in the crowd would have been "pure speculation."  Therefore, the Defendant has failed to show that the record clearly establishes that Lieutenant Pugh "surmised 'someone picked [the murder weapon] up.'"

Further, the Defendant has failed to show that a clear and unequivocal rule of law was breached or that consideration of the error is necessary to do substantial justice.  Tennessee Rule of Evidence 602 states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony."  A witness's knowledge may be inferred from the witness's statements or from the surrounding facts and circumstances.  State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000).  While the rule does not require "absolute certainty," a witness's or declarant's statement "may not be based on mere speculation." Id.  Non-expert witnesses giving testimony in the form of an opinion are limited to opinions that are "rationally based on the perception of the witness" and are "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a).  Rules on the admissibility of evidence are largely within the trial court's sound discretion, and we review the trial court's ruling for an abuse of discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002).

As noted above, Lieutenant Pugh clearly stated that he did not search anyone on the scene because he did not have reasonable suspicion that the Defendant passed the gun to anyone and that any suggestion that the Defendant passed the gun to someone in the crown would have been "pure speculation."  Lieutenant's Pugh's testimony was squarely within his personal knowledge as a police officer who responded to the scene of a shooting.  His testimony in no way offers any speculation as to the disposal or whereabouts of the murder weapon, and it certainly does not imply that "someone picked [the murder weapon] up" before police were able to search the area.  The Defendant's claim is wholly without merit, and he is not entitled to plain error relief.

*Cumulative Error*

Finally, the Defendant argues that the cumulative effect of the errors necessitates a new trial.  The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in

isolation, but "have a cumulative effect on the proceedings so great at to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, however, there must have been more than one actual error during the trial proceedings. Id. at 77. In this case, the Defendant has failed to show that any error occurred at trial. Therefore, the cumulative error doctrine does not apply.

### III. Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE